SUCESIÓN DE EMILIO DÁVILA, compuesta de sus hijos PETRA, EUGENIO y EMILIO DÁVILA MARRERO y de su VIUDA DOÑA NICOLASA MARRERO, demandante y apelante, *v.* OFELIA COLLAZO VIUDA DE SATORRA, demandada y apelada.

No. 5051.—*Sometido:* Noviembre 6, 1929. *Resuelto:* Junio 20, 1930.

*Colberg & Barceló Jr. y Romero & Campos del Toro,* abogados de la apelante; *Ulpiano Crespo Jr.,* abogado de al apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

La corte de distrito, después de celebrar un juicio sobre los méritos, declaró sin lugar una acción de desahucio, basada en la teoría de que estaba envuelto un conflicto de títulos.

La cuestión a resolver es si el caso debe regirse por un grupo de autoridades citadas por el Juez de Distrito o por una línea de decisiones en que se apoyan los apelantes.

Francisco Dávila falleció en diciembre de 1928. Su hermano, Inocencio Emilio Dávila, obtuvo declaratoria de herederos, y también falleció. Los aquí demandantes fueron entonces declarados únicos y universales herederos de Inocencio Emilio Dávila. Posteriormente, aunque antes de instarse el presente procedimiento, Ofelia Collazo y Carmen Martínez incoaron acción contra los aquí demandantes, en la cual solicitaban sentencia conteniendo los siguientes pronunciamientos:

"A. Que fué la intención, firme y decidida de don Francisco Dávila Dávila que la demandante Ofelia Collazo Vda. de Satorra y su hermana Carmen Martínez, sean las verdaderas heredera y legataria respectivamente de los bienes relictos al óbito de dicho causante.

"B. Que existía un contrato entre las demandantes y dicho Francisco Dávila Dávila, que se cumplió en vida de este último, y por ambas partes, con justa causa, el cual da derecho a las demandantes, al fallecimiento de aquél, de obtener la posesión y dominio de los bienes existentes.

"C. Que la declaratoria de herederos a favor de Inocencio Emilio Dávila Dávila, como heredero universal de Francisco Dávila Dávila, es nula y sin valor legal alguno, toda vez que dicho Francisco Dávila Dávila dispuso en vida de sus bienes y derechos en beneficio de las demandantes como presuntas herederas de él.

"D. Que se conceda cualquier otro remedio consistente con las alegaciones de las demandantes. . ."

Como parte introductora de una base para el remedio así solicitado, las demandantes en el procedimiento anterior, sobrinas de la premuerta esposa de Francisco Dávila Dávila, alegaron en una demanda jurada que habían vivido desde su niñez y por espacio de más de veinte años con su tío y su

tía, Francisco Dávila y esposa, quienes las habían tratado siempre como hijas adoptivas; y que en 1916 Ofelia había contraído matrimonio con Pedro Satorra y luego se había ido con él para España; y que en julio de 1921 Francisco Dávila le escribió la siguiente carta:

"Utuado, Pto. Rico, julio 25, 1921. Sra. Ofelia Collazo Satorra, Alguaire, Lérida. Por la del Dr. Massot de 5 de julio que estará en tu poder se habrán enterado de mi gran desgracia, muerte de mi inolvidable Margarita, de Gloria goce en Dios, no ceso de recordarla un momento, tú harás lo mismo y Satorra en sus oraciones. Yo estoy enfermo desde antes de su muerte pero salía y la atendía. Tomé cama el día siguiente y he estado de bastante cuidado, mejoro pero aun el Dr. Massot no me ha dado de alta aunque estoy bastante fuerte para poner estas líneas lo que no había podido hacer antes, celebraré estén buenos todos Uds. Yo haré un testamento a tu favor con ciertas cláusulas que deje en mis manos el usufructo de las fincas que me deja Margarita para los efectos de administración, venta, etc. de todas ellas pero dejaré las fincas agrícolas en manos de tu esposo Don Pedro Satorra para que las explote en provecho de Uds. dándome una mensualidad para yo poder vivir modestamente los días que me restan de este sufrir constante. Estas fincas con todo lo que encierran de ganado vacuno y caballar, montes, cafetos y demás establecimientos, casa, maquinaria, puede dar un buen beneficio anual para personas inteligentes y vigorosas como Uds. y sería un disparate malbaratarla en una venta ruinosa, yo no tengo ánimo para poder seguir regenteándolo y mi Margarita me decía, ESTOS ESTABLECIMIENTOS DESEO DEJARLOS A OFELIA PORQUE YO SÉ QUE ELLA ES LA ÚNICA QUE SABRÁ CONSERVARLOS. El cosecho pasado de café dió 123 q. cáscara seco en el pueblo y el collor suelo y cáscara como 309 q. y yo no puedo atenderlo, este año es menor la cosecha pues no se ha limpiado empezaré la próxima semana. La finca debe alrededor de 2000 pesos que si Satorra puede traerlos de allá. Dr. M. dice que si puedo tomarlos en el banco a 4 1/2/00 me los daría para que entre libre de ningún gravamen. Si es que Uds. tienen facilidad de venir lo más pronto posible para atender esta cosecha y quitarse de tanta molestia de invierno, y política anarquista, aquí está muy tranquilo todo en ese respecto, aunque la santidad no exista y siempre haya que luchar. La finca tiene más de 125 cuerdas de café pero resembrando dará más de 800 qq. en pocos años. La poca vigilancia que se observa en las cosechas hace una gran merma en la producción.—Querido compadre: Estudie el asunto y vea si les

conviene venir y pueden trasladarse a esta isla lo antes posible para poder atender a la finca. En ella tengo un joven honrado pero él sólo no puede dar atención y será necesario poner dos más y esto mermaría los beneficios. El café ha mejorado precio, se vendió días pasado hasta $15 pilado, ha bajado a 12 pero una vez normalizados los negocios, puede dar buen margen de beneficio, el tabaco está flojo pero hace más de un mes no he sabido nada. Todos disfrutaban el alta. Maderas majaguas son explotables. La finca tiene 4 cab., 3 yeguas, 2 potros, 4 vacas, 2 toros, 4 becerros. Si pudieran poner un cable si es que pueden venir, me será un alivio grande que me tranquilizaría. Yo vivo en la casa del pueblo y les recibiré aquí para que se acomoden con toda tranquilidad. Su compadre que les desea resignación y fuerza, Francisco Dávila.''

Entonces la demanda alega que esta carta fué precursora de correspondencia confirmando la promesa hecha y la obligación asumida por dicho Francisco Dávila de hacer herederas o beneficiarias suyas a las demandantes, y, actuando bajo ese entendido, Ofelia Collazo y su esposo Pedro Satorra se trasladaron de España a Puerto Rico en marzo de 1924 y vivieron en casa de Francisco Dávila; que la causa del contrato de Dávila haciendo herederas suyas a las demandantes, fué el cariño y el afecto que les profesaba; que en reciprocidad a tal cariño y afecto, y en consideración de los beneficios que les reportaba el convenio, las demandantes prestaron servicios personales a dicho Dávila, prodigándole un grado de cuidado y consideración de naturaleza tan peculiar y excepcional, que las demandantes no podían ser recompensadas en dinero, sino únicamente en la forma y modo propuestos por Dávila; que el citado Dávila estuvo enfermo durante largo tiempo, pero conservó el pleno ejercicio de sus facultades mentales hasta el momento de fenecer, y mientras estaba recluído en cama y a fin de cumplir su convenio con las demandantes, escribió el siguiente memorándum:

''Fco. Dávila Dávila, viudo de doña Margarita del Rosario, sin otro apellido, no tiene ascendientes ni descendientes. Nació en Juncos. Ofelia Collazo, sin otro apellido, casada con Pedro Satorra

Giró, residente en la Provincia de Lérida, pueblo de Alguaire, hija natural de Juliana Collazo, a ésta la deja como heredera universal. Quien hará un legado a Carmen Martínez Collazo, soltera, hija legítima de Pedro Martínez Collazo y de Juliana Collazo, sin otro apellido. Nombra albeceas a Octavio Vivó Nicolau. Contador Partidor a don Eduardo Artau.''

A esto siguen varias alegaciones respecto a la inexistencia de herederos forzosos, de la indiferencia de los dos hermanos, de las manifestaciones hechas por Dávila a sus amigos indicando su intención y propósito de que sus bienes pasaran a las demandantes, así como en torno a otros extremos.

■■ Los autos del pleito anterior fueron presentados como prueba en este procedimiento, y se señala como error la admisión de los mismos. La objeción en la corte inferior se basó en la impertinencia e ''irrelevancia'' de esos autos, unida a la manifestación de que una controversia pendiente entre las partes no prueba otra cosa que el hecho de haberse radicado un pleito en la secretaría de la corte. La argumentación en el alegato de los apelantes se dirige a la cuestión del valor probatorio más bien que a la de admisibilidad. Para los fines de esta opinión, puede admitirse que una demanda jurada, sin más, no establece los hechos alegados en ella al ser presentada como prueba en otra causa. No incumbía a la demandada en el presente caso establecer los hechos alegados por ella y su hermana en el pleito anterior. Tampoco es necesario que determinemos si prueba de haberse incoado otro litigio es suficiente o no para demostrar que los derechos respectivos de las partes están ''más o menos en disputa,'' dentro del significado de esa frase según la usa la Corte Suprema de España en su sentencia de enero 4, 1900, y este Tribunal en un número de casos. Véase *Mehrhof,* v. *Rodríguez et al.,* 14 D.P.R. 59; *Sucesión Colón* v. *Colón et al.,* 27 D.P.R. 87.

Si la prueba de ese hecho tiene relación con la cuestión relativa a la existencia de un conflicto de títulos, tal prueba

es pertinente. Si tiene suficiente valor probatorio para servir como un contrapeso apreciable para resolver esa cuestión, ella es relevante. Sin embargo, este tribunal ha expresado en repetidas ocasiones que: "Cuando el demandado alega algún título para la posesión, si esa alegación no está desnuda de toda prueba no debe decretarse el desahucio y deberán las partes discutir en juicio ordinario cuál tiene el título legal a la finca, antes de que pueda prosperar tal clase de acción." Véase *Torres et al.* v. *Pérez,* 18 D.P.R. 573; *Miranda* v. *Camerón et al.,* 19 D.P.R. 488, y *Andino* v. *Canales,* 27 D.P.R. 281. Otra forma de exponer esta doctrina es la siguiente: "Cuando en una acción de desahucio por precario el demandado contesta alegando que no posee en tal concepto sino en el de dueño, y presenta alguna evidencia que aparentemente demuestra que su posesión no es precaria, no debe declararse con lugar la demanda de desahucio." *Gandía* v. *Cabán,* 22 D.P.R. 833.

Puede ser que la demanda en cuestión no aduzca hechos suficientes para determinar causa de acción. Quizá ni siquiera podría ser enmendada para que aduzca una buena causa de acción. El procedimiento sumario de desahucio no proporciona una oportunidad razonable para investigar y dirimir estas cuestiones. Asumiendo, sin resolverlo, que se puede recabar de una corte en que se celebra un juicio, que considere cuestiones, por afectar la admisibilidad de prueba en una acción de desahucio, toda duda razonable debe ser resuelta a favor de la suficiencia de la alegación. Un examen detenido de la opinión del caso de *Pastor Gomila* v. *Miró Pastor,* 34 D.P.R. 52, bastará para distinguir ese caso del presente, y al mismo tiempo para demostrar que la demanda jurada a que hemos hecho referencia no es una demanda simulada. El hecho de que tal demanda haya sido radicada tiende a demostrar la buena fe de la reclamación de la demandada en cuanto al título y derecho de posesión ínterin se determine tal reclamación, aunque la mala fe no se presume. Demuestra que el título de la propiedad de que se trata en

el procedimiento de desahucio está directamente envuelto en un litigio pendiente. Constituye alguna prueba de la existencia de una nube sobre el título de los demandantes. No es, por tanto, ni "irrelevante," ni impertinente.

En el juicio del presente caso, Ofelia Collazo declaró que desde que ella tenía diez años había vivido con su tío y padre de crianza, Francisco Dávila; que tres años después de haber ella contraído matrimonio se fué para España con su esposo Pedro Satorra Giró; que mientras ella residía en España Dávila le escribía mensualmente a ella, y a su esposo; que ella regresó a Puerto Rico después del fallecimiento de su tía, por haberle escrito Dávila sobre su intención de hacerla única heredera, y la mandó a buscar para que le cuidara, porque se sentía muy mal; que él pagó el pasaje y que ella llegó a Puerto Rico en abril de 1924 y fué a vivir a casa de él; que al llegar ella, él le confirmó la oferta que ya le había hecho; que su esposo tuvo dificultades con las autoridades de inmigración, y quedó detenido en Cuba; que Dávila le dijo que lo cuidara hasta tanto llegase el esposo de ella, y manifestó además que cuando se resolviera la cuestión al margen de la admisión del esposo, aquél cumpliría su promesa, y que la cumplió; que la testigo y su hermana cuidaron a Dávila hasta el momento de su muerte; que en su lecho mortuorio ratificó el convenio; que después de haber fenecido él, la testigo y sus hermanos quedaron a cargo de la herencia; que la declarante continuó viviendo como dueña en la casa que antaño había ocupado, y sus hermanos siguieron encargándose de las fincas rústicas; que la testigo y su hermana, Carmen Martínez, reclaman la herencia como dueñas de la misma; que la testigo aún reside en la casa a título de dueña; que le fué dejada por su tío y padre de crianza, Francisco Dávila; y que la testigo había entablado acción reclamando la herencia prometídale y dejádale por Francisco Dávila.

En la repregunta, el letrado de los demandantes extrajo la información adicional de que Dávila había dejado testa-

mento a favor de la testigo; que él le dijo a su hermana que lo había dejado en el Banco de Ponce; que el testamento había sido redactado por el Lcdo. Marín Marién; que el testamento fué otorgado poco después de la muerte de la esposa de Dávila en 1921; que Marín le dijo a la testigo que él había redactado el testamento; que Marín no le dió a ella copia de él porque ''nosotros teníamos la minuta o copia simple; que la testigo tiene la copia simple, que será presentada como prueba en el otro caso; que la testificante no la trajo consigo al juicio porque no se le pidió que la presentara; que en el testamento se nombraba a Eduardo Artáu y a Octavio Vivó como albaceas; que el testamento está fechado en 1921; que Marín manifestó a la testigo que él había llevado el testamento a Dávila para que lo firmara, y ''lo dejó hecho a mi favor''; que Dávila siempre manifestó que había otorgado testamento a favor de la dicente; que Dávila tenía un testamento firmado; que la testigo no sabe si el testamento redactado por Marín fué suscrito ante él; que la declarante estaba en posesión de la herencia a virtud del contrato celebrado por ella con Dávila para que viniera a Puerto Rico a hacerse cargo con la hermana de la asistencia de él, con el entendido de que la dejaría en posesión de la herencia en pago de sus servicios; que Dávila manifestó a sus amigos que la testigo era su única heredera; que él dejó a ésta y a su hermana en posesión de la herencia para compensarlas por sus servicios; que dejó una copia simple del testamento; que Marín manifestó a la testigo que él había redactado el testamento original y la había llevado a Francisco Dávila; y que la testigo halló la minuta sin firmar.

La declaración de esta testigo no es muy satisfactoria. En el examen directo no llega a referirse a la minuta que se alega fué preparada por Dávila poco antes de su muerte. Hay una marcada diferencia entre la alegación relativa a la existencia de ese memorándum y la referencia a una copia simple o minuta de un testamento redactado por un notario

en 1921. No obstante, si esa aseveración no era cierta, se abrió de par en par una puerta para impugnar la declaración, y los demandantes dejaron de aprovecharse de ella. No podemos asumir que si se hubiese puesto al Lcdo. Marín Marién en la silla testifical, él habría hecho un relato distinto.

De todos modos, la declaración de Ofelia Collazo abarca todo el campo de la acción anterior en su aspecto más estrecho, conforme indica el título, en que se describe la acción como una de cumplimiento específico de contrato. Si la demanda, considerada como de cumplimiento específico de contrato, aduce o no hechos suficientes para determinar causa de acción, es cuestión que, por las razones ya expuestas, no es necesario dilucidar ahora. La corte de distrito no estaba juzgando el caso de Ofelia Collazo y Carmen Martínez v. Eugenio R. Dávila Marrero et al. Estaba resolviendo una acción de desahucio.

La demandada alega tener derecho a la posesión de la casa que habita. El pretendido derecho de los demandantes como dueños de la finca para desahuciar en precario a la demandada está "más o menos en disputa." A duras penas podría decirse que la alegación de la demandada "está desnuda de toda prueba." De ello se desprende que existe un conflicto de títulos, en el sentido en que esa frase ha sido usada en nuestras anteriores decisiones.

Entre los casos en que se apoyan los apelantes, el que más se aproxima al punto es tal vez el de *León* v. *Alvarado*, 24 D.P.R. 700. Allí, el demandante en el procedimiento de desahucio había obtenido su título de la finca en cuestión como resultado de una acción anterior entre las mismas partes. El segundo párrafo del sumario dice así:

"El hecho de que el demandado en un juicio de desahucio haya pedido la nulidad del pleito que produjo la venta y adjudicación al demandante de la finca objeto del desahucio, no es motivo para declarar que el demandante no tenga título suficiente para obtener sentencia favorable, porque mientras no se anule el juicio y la venta,

su título es válido, seguirá siendo el dueño, y como tal con derecho a que el demandado desocupe la finca.''

En el caso de autos, la demandada no trata de anular una sentencia dictada en un litigio anterior entre ella y los demandantes, ni de dejar sin efecto una venta judicial efectuada a consecuencia de tal acción. El procedimiento de declaratoria de herederos atacado por la demandada fué ex parte. Su título de la finca envuelta en el procedimiento de desahucio no depende de ninguna irregularidad o defecto en el procedimiento de declaratoria de herederos. Emana de una fuente anterior. Ella no trata de establecer su derecho mediante la anulación del título de los demandantes, sino que se basa en un título independiente que alega es superior al de los demandantes. La doctrina del caso de León es manifiestamente inaplicable.

El caso de *Hernández* v. *Algarín,* 30 D.P.R. 846, giró sobre el artículo 641 del Código Civil, que exige que una donación de bienes inmuebles se haga constar en escritura pública. El artículo 4 del Capítulo que trata sobre testamentos no contiene tal disposición.

Un ligero examen del caso de *Lafontaine et al.* v. *Lafontaine et al,* 30 D.P.R. 194, y del de *Marrero* v. *Plumey,* 35 D.P.R. 1015, los distinguirá del presente.

*Debe confirmarse la sentencia recurrida.*

El Juez Asociado Señor Texidor no intervino.